1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALAN ALFONSO NOGUEDA,                        No.  2:14-cv-1045 GGH P

12                      Petitioner,

13          v.                                     ORDER

14   SUZANNE M. PEERY,[1]

15                      Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.[2]  Petitioner challenges a judgment of conviction entered against

19   him on February 17, 2011 in the Yolo County Superior Court on charges of assault with a

20   semiautomatic firearm (four counts), corporal injury to the parent of his child, false

21   imprisonment, making criminal threats (two counts), endangering the health of a child, and two

22   other misdemeanor violations.  (Res't's Lod. Doc. 1, CT 258-59.)  He seeks federal habeas relief

23   on the following grounds: (1) insufficient evidence to support assault with a semi-automatic

24   _____

25   [1]  The People (of the State of California) was previously named as the respondent.  Suzanne Peery
     is currently the warden of High Desert State Prison, where petitioner is incarcerated.  "A
     petitioner for habeas corpus relief must name the state officer having custody of him or her as the
26   respondent to the petition."  Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th
     Cir.1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254).  Accordingly, the court substitutes Suzanne
27   Peery as respondent.
     [2]  This action is before the undersigned pursuant to the parties' consent to proceed before a
28   magistrate judge.  28 U.S.C. § 636(c).

                                                 1

firearm in count one; (2) insufficient evidence to support assault with a semi-automatic firearm in counts seven and nine; (3) trial court error in "failing to instruct the jury *sua sponte* that an unloaded gun not used or threatened as a bludgeon could not support a finding of present ability to inflict an injury;" (4) ineffective assistance of trial counsel in failing to request a jury instruction after the prosecution conceded the gun was unloaded, that petitioner could not be tried for assault with a semi-automatic gun on these facts; (5) ineffective assistance of trial counsel in failing to object to petitioner being shackled during the trial; and (6) ineffective assistance of trial counsel for failing to object to highly prejudicial testimony introduced by the prosecution which had little or no probative value.[3]  Upon careful consideration of the record and the applicable law, the undersigned concludes that that the ineffective assistance of counsel claims should be granted with respect to failure to request an instruction that required the semi-automatic weapon to be loaded.  The court further orders an evidentiary hearing on the ineffective assistance claim concerning shackling at trial.

BACKGROUND

In its unpublished opinion, affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Lorena Aramburo was the mother of defendant's daughter. On the date of the incident in question, July 2, 2010, Aramburo and defendant were no longer in a relationship, because Aramburo ended the relationship when defendant went to jail. However, Laura Rodriguez, defendant's mother, helped Aramburo watch the baby.
>
> On July 2, 2010, the baby was staying with Rodriguez, and Aramburo went there to pick her up around 8:00 p.m. Rodriguez's other son, Marcelino, was also at Rodriguez's house. Defendant arrived at the house, and Aramburo got up to leave. She testified that she saw defendant do something with his hands, but did not see anything in his hands. At trial, she acknowledged that she said defendant came in carrying a gun in her earlier testimony at the preliminary hearing. She testified at trial that she heard a click that sounded like he was loading a gun. She testified she thought he was doing it just to scare her, and that the gun was just a toy.

---

[3] Claims seven and eight were previously dismissed by order, filed October 23, 2014.  (ECF No. 17.)

Defendant said he wanted to talk to Aramburo. She did not want to talk to him, so she picked up the baby and started to walk out the door. Defendant followed her as she walked to her truck. He grabbed the baby's car seat, saying all the while that he wanted to talk to her. They began arguing. He accused her of going out with someone else.

Aramburo acknowledged that she had stated at the preliminary hearing that defendant pulled a gun out, but testified at trial she could not say for sure it was a gun. She testified that she was sitting in her truck when defendant began hitting her. She testified he hit her repeatedly with his fists and with the gun, and held the gun against the side of her head and told her he was going to kill her. She no longer thought the gun was a toy. He bit her on her nose, cheek, lip, and ear.

Aramburo slid out of the truck onto the ground, hoping defendant would quit hitting her. He did not stop, however. A neighbor arrived and pleaded with him to stop and calm down. Defendant did not stop, but went on hitting Aramburo, and began kicking her. Defendant's mother and brother, Marcelino, came out to the truck. They tried to stop defendant by grabbing and pulling at him, but he went on as if he was crazy and the only thing he wanted to do was hurt Aramburo.

Finally, defendant calmed down. Then Aramburo's cell phone rang. Defendant answered it. He started arguing with the person on the phone, and said "[s]omething about Sureños or something like that." The person on the phone was an acquaintance of Aramburo's brother. He was calling because he wanted to talk to Aramburo's brother. Defendant threw down the phone and said he was going to kill Aramburo, called her a bitch, then hit her again.

Aramburo tried to run away from defendant, but he grabbed her, threw her on the ground, and tried to hit her again. His mother intervened, but he continued to hit and kick Aramburo. Aramburo was able to get near the neighbors for protection.

Defendant then grabbed the baby. His mother implored him to think of the baby. He said, "Well, what's the big deal? The kid isn't even mine." At this point, one of the neighbor's took Aramburo into her trailer home.

Officer Jerry Watson responded to the scene and interviewed Aramburo. Aramburo was crying and hysterical. She said that defendant held a gun to her head. She also told him that defendant pointed a gun at both Rodriguez and the baby. Officer Renaldo Monterrosa interviewed Rodriguez. Rodriguez told him that defendant had assaulted her when she tried to intervene. Rodriguez told Monterrosa that defendant threatened to kill both of them. He also held the gun while holding the baby, and said he was going to kill it because it was not his. He pointed the gun at Rodriguez at one point as well, and said that if anyone tried to take away the baby, he would kill them.

Officer Jason Fortier also took a statement from Rodriguez. Rodriguez informed him she had seen defendant with a chrome handgun. Fortier searched a nearby gas station because Rodriguez said she saw defendant enter the parking lot of the station and walk toward the rear. Fortier found a gun on the lifting rail of a trash dumpster. The gun was not loaded and the magazine was unloaded. Fortier searched the area, but did not find any ammunition.

Aramburo admitted talking to defendant's mother about the case, and that Rodriguez told her defendant would get 48 years in jail because of the gun. Aramburo admitted she still loved defendant and did not want anything bad to happen.

Rodriguez admitted talking to Aramburo about the case and telling her to testify that there was not a gun involved in the incident. Rodriguez testified she told Aramburo this because at the moment Aramburo claimed defendant had hit her with a gun, Rodriguez had not seen any gun.

Defendant was charged with assault with a semiautomatic firearm (§ 245, subd. (b)) against Aramburo (counts 1 and 2 for aiming the gun and hitting with the gun, respectively), against Rodriguez (count 7), and against the baby (count 9). As to each count of assault with a semiautomatic firearm, it was alleged that defendant willfully and unlawfully personally used a firearm pursuant to section 12022.5, subdivision (a).

Count 3 charged defendant with false imprisonment with force and violence against Aramburo (§§ 236, 237, subd. (a)) and alleged a section 12022.5, subdivision (a), enhancement.

Count 4 charged defendant with corporal injury to the parent of his child (§ 273.5, subd. (a)), and also alleged a section 12022.5, subdivision (a), enhancement.

Counts 5, 6, and 8 charged defendant with making threats to commit a crime resulting in death or great bodily injury (§ 422) against Aramburo (counts 5 and 6) and Rodriguez (count 8). The information alleged section 12022.5, subdivision (a), enhancements to these charges.

Count 10 alleged that defendant abused or endangered the health of a child. (§ 273a, subd. (a).) The information alleged a section 12022.5, subdivision (a), enhancement to this charge. Counts 11 and 12 alleged misdemeanor violations not pertinent to this appeal.

With the exception of the charge that defendant threatened to commit a crime resulting in death or great bodily injury to his mother, Rodriguez, the jury convicted defendant of all felony charges. The jury found the section 12022.5, subdivision (a), enhancement true as to all counts upon which defendant was convicted, except counts 3 (false imprisonment) and 6 (threats to commit a crime resulting in death or great bodily injury to Aramburo after her cell phone rang).

4

1    The trial court sentenced defendant to a total prison term of 26
2    years 8 months.

3   People v. Nogueda, 2013 WL 542033 at *1-3 (Feb. 14, 2013).

4          After petitioner's judgment of conviction was affirmed by the California Court of Appeal,

5   he filed a petition for review in the California Supreme Court.  (Resp't's Lod. Doc. 2.)  The

6   Supreme Court denied review on May 15, 2013.  (Resp't's Lod. Doc. 3.)  Petitioner filed a habeas

7   corpus petition in Yolo County Superior Court on May 19, 2014.  (Resp't's Lod. Doc. 4.)  On

8   April 28, 2014, petitioner filed a federal habeas petition in this court, as well as a motion for stay

9   and abeyance.  That motion was denied on October 23, 2014, and claims seven and eight were

10  dismissed as unexhausted at that time.  (ECF No. 17.)

11  DISCUSSION

12  I.  AEDPA Standards

13         The statutory limitations of federal courts' power to issue habeas corpus relief for persons

14  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

15  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

16         An application for a writ of habeas corpus on behalf of a person in
17         custody pursuant to the judgment of a State court shall not be
           granted with respect to any claim that was adjudicated on the merits
18         in State court proceedings unless the adjudication of the claim-

19         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
20         determined by the Supreme Court of the United States; or

21         (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
22         State court proceeding.

23         As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

24  2254(d) does not require a state court to give reasons before its decision can be deemed to have

25  been 'adjudicated on the merits.'"  Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 785 (2011).

26  Rather, "when a federal claim has been presented to a state court and the state court has denied

27  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

28  of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

5

1    v. Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when

2    it is unclear whether a decision appearing to rest on federal grounds was decided on another

3    basis).  "The presumption may be overcome when there is reason to think some other explanation

4    for the state court's decision is more likely."  Id. at 785.

5         The Supreme Court has set forth the operative standard for federal habeas review of state

6    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an *unreasonable*

7    application of federal law is different from an *incorrect* application of federal law.'"  Harrington,

8    supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000).

9    "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

10   'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786,

11   citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

12        Accordingly, "a habeas court must determine what arguments or theories supported or …

13   could have supported[] the state court's decision; and then it must ask whether it is possible

14   fairminded jurists could disagree that those arguments or theories are inconsistent with the

15   holding in a prior decision of this Court."  Id.  "Evaluating whether a rule application was

16   unreasonable requires considering the rule's specificity.  The more general the rule, the more

17   leeway courts have in reaching outcomes in case-by-case determinations."  Id.  Emphasizing the

18   stringency of this standard, which "stops short of imposing a complete bar of federal court

19   relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has

20   cautioned that "even a strong case for relief does not mean the state court's contrary conclusion

21   was unreasonable."  Id., citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003).

22        The undersigned also finds that the same deference is paid to the factual determinations of

23   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

24   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

25   decision that was based on an unreasonable determination of the facts in light of the evidence

26   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

27   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

28   factual error must be so apparent that "fairminded jurists" examining the same record could not

1  abide by the state court factual determination.  A petitioner must show clearly and convincingly

2  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.

3  969, 974 (2006).

4        The habeas corpus petitioner bears the burden of demonstrating the objectively

5  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

6  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

7  show that the state court's ruling on the claim being presented in federal court was so lacking in

8  justification that there was an error well understood and comprehended in existing law beyond

9  any possibility for fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  "Clearly

10  established" law is law that has been "squarely addressed" by the United States Supreme Court.

11  Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of

12  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

13  Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state

14  sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear

15  prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly

16  established law when spectators' conduct is the alleged cause of bias injection).  The established

17  Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other

18  controlling federal law, as opposed to a pronouncement of statutes or rules binding only on

19  federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

20        The state courts need not have cited to federal authority, or even have indicated awareness

21  of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S. Ct. at 365.

22  However, where the state courts have not addressed the constitutional issue in dispute in any

23  reasoned opinion, the federal court will independently review the record in adjudication of that

24  issue.  "Independent review of the record is not de novo review of the constitutional issue, but

25  rather, the only method by which we can determine whether a silent state court decision is

26  objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

27        When a state court decision on a petitioner's claims rejects some claims but does not

28  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

1  the federal claim was adjudicated on the merits.  <u>Johnson v. Williams</u>, ___ U.S. ___, 133 S. Ct.

2  1088, 1091 (2013).  However, if the state courts have not adjudicated the merits of the federal

3  issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of

4  federal law.  <u>Stanley v. Cullen</u>, 633 F.3d 852, 860 (9th Cir. 2012).

5  II.  <u>Insufficient Evidence</u>

6      Claims One and Two assert that the evidence was insufficient to support assault with a

7  semi-automatic firearm in counts one, seven and nine, respectively.  Petitioner contends that no

8  evidence was presented to show the gun was loaded, and in fact when the police found the gun

9  minutes after petitioner had been seen near where the gun was located, it was unloaded.  K-9 units

10  did not smell gun powder and no ammunition was found.  He also claims that the victim did not

11  testify that petitioner threatened to shoot her, the baby or himself, which would indicate that the

12  weapon was not loaded.  Petitioner further contends that (during closing argument) the prosecutor

13  conceded the gun was not loaded, but then argued that it was loaded, violating petitioner's right to

14  a fair trial.  Petitioner concludes that "assault with a firearm cannot be carried out with an

15  unloaded gun."

16      Respondent counters that the prosecutor never conceded the gun was not loaded, and in

17  any event, the state appellate court collected all evidence in favor of the judgment in its

18  sufficiency determination.  As the prosecutor's possibly unclear statements were only argument,

19  they had no evidentiary value, and were not considered by the jury in accordance with the court's

20  instruction.  In regard to the other arguments that the gun was not loaded, respondent asserts that

21  the state appellate court considered the evidence in the light most favorable to the judgment in

22  concluding there was sufficient evidence that the gun was loaded, and its decision was not

23  unreasonable in light of <u>Jackson</u>.

24      The California Court of Appeal rejected the argument that there was insufficient evidence

25  that the gun was loaded, as set forth in the following portion of the opinion:

26          In determining whether the evidence was sufficient to support a
            conviction, we review " ' "the entire record in the light most
27          favorable to the prosecution to determine whether it contains
            evidence that is reasonable, credible, and of solid value, from which
28          a rational trier of fact could find the defendant guilty beyond a

1

2

3

reasonable doubt." ' " ( *People v. Valdez* (2004) 32 Cal.4th 73, 104.) We presume the existence of every fact that could reasonably be deduced from the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 58.)

4

5

6

Defendant argues there was no evidence the gun was loaded. Not so. Even though the gun retrieved by police sometime after the incident was not loaded, the jury could have drawn an inference that the gun was loaded from Aramburo's description of the sound she recalled defendant making when he first entered his mother's home. She said it sounded like he was loading a gun.

7

8

9

10

11

Also, a defendant's own words and conduct may support an inference that the weapon was loaded. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 13.) Thus, a defendant's statement " 'I have got you now,' " and "halt or 'I'll shoot,'" while pointing a gun may constitute sufficient evidence to warrant an inference that the gun was loaded. (*Ibid.*) Here, defendant held the gun to Aramburo's head and told her he was going to kill her. As the jury could have reasonably inferred from defendant's words and actions that the gun was loaded, there was sufficient evidence to support the judgment.

12    (2013 WL 542033 at *3-4.)

13        A. <u>Legal Standards</u>

14        When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is

15    available if it is found that upon the record evidence adduced at trial, viewed in the light most

16    favorable to the prosecution, no rational trier of fact could have found "the essential elements of

17    the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct.

18    278 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction

19    based on sufficiency of the evidence. <u>U.S. v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir.2010) (en

20    banc). First, the court considers the evidence at trial in the light most favorable to the

21    prosecution. <u>Id.</u>, citing <u>Jackson</u>, 443 U.S. at 319, 99 S. Ct. 2781. "'[W]hen faced with a record of

22    historical facts that supports conflicting inferences,' a reviewing court 'must presume-even if it

23    does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in

24    favor of the prosecution, and must defer to that resolution.'" <u>Id.</u>, quoting <u>Jackson</u>, 443 U.S. at

25    326, 99 S. Ct. 2781.

26        "Second, after viewing the evidence in the light most favorable to the prosecution, a

27    reviewing court must determine whether this evidence, so viewed is adequate to allow 'any

28    rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" <u>Id.</u>,

1    quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781.  "At this second step, we must reverse the

2    verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact

3    finders would have to conclude that the evidence of guilt fails to establish every element of the

4    crime beyond a reasonable doubt."  Id.

5         Put another way, "a reviewing court may set aside the jury's verdict on the ground of

6    insufficient evidence only if no rational trier of fact could have agreed with the jury."  Cavazos v.

7    Smith, ___ U.S. ___, 132 S.Ct. 2, 4 (2011).  Sufficiency of the evidence claims in federal habeas

8    proceedings must be measured with reference to substantive elements of the criminal offense as

9    defined by state law.  Jackson, 443 U.S. at 324 n.16.

10        In conducting federal habeas review of a claim of insufficient evidence, "all evidence

11   must be considered in the light most favorable to the prosecution."  Ngo v. Giurbino, 651 F.3d

12   1112, 1115 (9th Cir. 2011).  "Jackson leaves juries broad discretion in deciding what inferences

13   to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

14   inferences from basic facts to ultimate facts.'"  Coleman v. Johnson,___ U.S. ___, 132 S.Ct.

15   2060, 2064 (2012) ( per curiam ) (citation omitted).  "'Circumstantial evidence and inferences

16   drawn from it may be sufficient to sustain a conviction.'"  Walters v. Maass, 45 F.3d 1355, 1358

17   (9th Cir.1995) (citation omitted).

18        Superimposed on these already stringent insufficiency standards is the AEDPA

19   requirement that even if a federal court were to initially find on its own that no reasonable jury

20   should have arrived at its conclusion, the federal court must also determine that the state appellate

21   court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable

22   determination.  Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).  Because this case is governed by

23   the AEDPA, this court owes a "double dose of deference" to the decision of the state court.  Long

24   v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 960 (9th

25   Cir. 2011).

26        B.  Analysis

27        Petitioner was convicted of violating Cal. Penal Code § 245(b), which provides that [a]ny

28   person who commits an assault upon the person of another with a semiautomatic firearm shall be

10

1   punished by imprisonment in state prison for three, six, or nine years.  In California, there are two

2   ways one can be convicted of an assault with a semi-automatic firearm pursuant to Cal Penal

3   Code § 245 (b): the use of a loaded firearm, and using the firearm, loaded or not, on a person.

4   People v. Miceli, 104 Cal. App. 4th 256, 268 (2002).  Although that part of the rule which

5   requires that the weapon be loaded if it is not used as a bludgeon has come under criticism,

6   Miceli, supra, it still remains the law of California.  See People v. Rodriguez, 20 Cal 4th 1, 11 (fn.

7   3) (1999), People v. Fain, 34 Cal. 3d 350, 357 (fn.6) (1983) (citing older cases). [4]  However,

8   under California law, whether or not a gun was loaded is a question of fact for the jury, and can

9   be proved by circumstantial evidence.  Rodriguez, 20 Cal.4th at 11-12.  See also People v. Orr, 43

10  Cal.App.3d 666, 672, 117 Cal.Rptr. 738 (1974).  See also People v. Montgomery, 15 Cal.App.

11  315, 318 (1911) (evidence that defendant was enraged and then accosted victim with the words,

12  "I have got you now," adequate to find gun loaded); People v. Lochtefeld, 77 Cal.App.4th 533,

13  541, 91 Cal.Rptr.2d 778, (2000) (evidence of defendant's present ability to injury was sufficient

14  where defendant's "own words and actions, in both verbally threatening and in displaying and

15  aiming the gun at others, fully supported the jury's determination the gun was sufficiently

16  operable")

17      As set forth in the background of the court of appeals opinion *supra*, Count 1 pertained to

18  aiming the gun at Aramburo; Count 2 was for hitting her with the gun; count 7 was for aiming the

19  gun at Rodriguez, and count 9 was for aiming the gun at the baby.  Petitioner has raised

20  insufficiency of the evidence with respect to counts 1, 7 and 9 only.  Therefore, for the counts at

21  issue, there must have been sufficient evidence that the weapon was loaded.

22      Viewing the evidence in the light most favorable to the verdict, and for the reasons

23  described by the California Court of Appeal, the undersigned concludes that there was sufficient

24  evidence from which a rational trier of fact could have found beyond a reasonable doubt that

25  petitioner was guilty of assault with a semiautomatic firearm.  Aramburo testified that when

26  _____

27  [4]  Of course, simply because a rule established by the California Supreme Court is old, lower
    courts do not have a license to ignore it.  Action must be taken by the state supreme court or
    legislature to change the rule.  See People v. Lochtefeld, 77 Cal. App. 4th 533, 542 (fn. 10)

28  (2000) (urging the state supreme court to reconsider the rule.)

petitioner came into the house, she knew he had a gun because although she did not immediately

see it, she heard a sound as if petitioner was loading it.  (RT 77.)  Furthermore, as noted by the

state appellate court, pursuant to Rodriguez, the defendant's words and conduct can support an

inference that the gun was loaded.  In this case, Aramburo testified that petitioner hit her twenty

times with the gun because although she did not see it at the time he was hitting her, she could

feel that it was a gun.[5]  (RT 119.)

 Petitioner's mother, Laura Rodriguez, gave a statement to responding police officer

Monterrosa, a native Spanish speaker, in Spanish.  (RT 272-73.)  She reported that petitioner

assaulted her and Lorena Aramburo and threatened to kill them.  (RT 276.)  Ms. Rodriguez also

reported that as petitioner was holding the baby and the gun, he threatened to "kill the baby

because it wasn't his."  (RT 277.)  She told the officer that he pulled the baby out of the car while

holding the gun, and he made this statement at that time.  (RT 277-78.)  Ms. Rodriguez then told

the officer that during the time she was following petitioner and trying to get the baby back, he

"pointed the gun [directly] at her at one time and said, you know, if anybody tries to take the baby

away from me, I'm going to kill them."  (RT 278.)  Because of this statement, Ms. Rodriguez

became scared and stopped following him.  (RT 279.)

 Officer Monterrosa also testified that he translated from Spanish to English Aramburo's

statement given to Officer Watson at the scene, and she reported that petitioner pointed the gun at

Laura Rodriguez and at the baby.  (RT 282-83.)  According to Aramburo, petitioner also grabbed

the baby and pointed the gun at the baby.  She reported that petitioner made a statement to the

effect of "this F'ing baby is not mine," which is similar to the statement Laura Rodriguez reported

him making.  (RT. 284.)  Lorena Aramburo also reported to the officers that petitioner pointed the

gun at her "after she started going after him to get the baby back."  (RT 297.)

 Ms. Rodriguez also reported to police officer Fortier, through her son Marcelino, who

interpreted for her, that petitioner pointed a gun at her while holding the baby, and said that "he

---

[5]  Although the beating of Lorena Aramburo with the gun related to Count 2 which is not
included in the grounds raised by petitioner, it is relevant to Count 1, which was the assault by
pointing the gun at her.

12

1   would shoot and kill her and that he would shoot anyone else that came near him." (RT 342.)

2   Ms. Rodriguez also reported through simulation that petitioner held the baby in one hand, and the

3   gun in the other hand.  She then demonstrated what petitioner did next by pointing her finger like

4   a gun at the baby's head. (RT 343.)

5          Officer Watson's testimony at trial was also direct in describing Ms. Aramburo's report to

6   Officer Monterrosa and himself that petitioner pointed a gun to her head.  (RT 379.)  She did not

7   report merely that she believed or thought it was a gun, but was certain it was a gun as she

8   personally saw it.  (RT. 379-80.)  Officer Watson's testimony was consistent with Officer

9   Monterrosa's testimony that Ms. Aramburo reported seeing petitioner point a gun at his own

10  mother and her baby.  (RT 380.)

11         It is true that certain witnesses testified at trial that they did not witness a gun or did not

12  recall witnessing a gun; however, their testimony seemingly contradicted their reports to officers

13  at the scene, and the jury was free to choose which statements to believe.  See e.g. RT 173-77,

14  181, 184, 196-97 (petitioner's mother, Laura Rodriguez, was questioned regarding her

15  inconsistent statements to police that petitioner pointed a gun at her, Lorena and the baby, but

16  testified at trial both that petitioner did not use a gun, and that she could not recall whether he

17  pointed a gun).  Rodriguez also failed to appear pursuant to a subpoena by the District Attorney.

18  (RT 178.)  Lorena Aramburo testified that she did not see petitioner point a gun at anyone,

19  including his mother or Aramburo's baby, yet her statements to police indicated that she did

20  witness petitioner pointing a gun at his mother and at the baby.  (RT 125, 127, 128.)  She also

21  testified that petitioner's mother told her, while crying, "that they were going to give him 48 years

22  in jail, and that nearly all the time that he was going to get was because he carried a gun for

23  threatening," possibly insinuating that she did not want petitioner to be subject to a longer prison

24  sentence if a gun was involved, and that there should be no testimony to this effect.  (RT 129.)

25  See also RT 237-38, 242 (Marcelino Nogueda's testimony that he did not recall talking to officers

26  about a gun, despite police reports to the contrary, then testifying that he saw the gun, "but not

27  that much"); and RT 342 (Marcelino's report to Officer Fortier while translating for his mother,

28

13

1  Laura Rodriguez, that petitioner pointed a gun at her).[6]

2      In his traverse, petitioner attempts to argue that the case relied upon by the Court of

3  Appeals in petitioner's state appeal reversed the defendant's conviction for assault based on an

4  absence of evidence that the gun was loaded.  ECF No. 27 at 2, citing People v. Rodriguez, 20

5  Cal.4th 1(1999).  Petitioner relies, however, on the court of appeals decision in Rodriguez, which

6  was later reversed by the California Supreme Court in Rodriguez.  The State Court of Appeals in

7  petitioner's own appeal relied on the Supreme Court reversal of the Court of Appeals in

8  Rodriguez, and held that a defendant's statements and behavior while making an armed threat

9  may warrant an admission of defendant's present ability to harm the victim, and a jury may so

10  find.  Id. at 13.  See Answer, Exhibit A, ECF No.23-1 at 8.

11      In a case with similar facts, Green v. Lattimore, 2009 WL 4572908, *6 (C.D. Cal. Dec. 1,

12  2009), the court found that the jury conviction for assault with a firearm was proper where

13  evidence showed the petitioner forced the victim onto her knees by pointing a gun at her as if

14  loaded, hit her on the head with it, and threatened to kill her, along with actions of petitioner's

15  accomplice which implied gun was loaded.

16      There was sufficient evidence of petitioner's statements in regard to all three victims

17  indicating that he was threatening to shoot or kill the victims at the time he pointed the gun at

18  them, permitting an inference to be drawn that the gun was loaded.  Whether the gun was actually

19  loaded or not is not of sufficient consequence for purposes of exceeding the low bar for

20  sufficiency of the evidence.  Consequently, petitioner's argument that statements by the

21  prosecutor conceding the gun was unloaded are also not sufficiently probative.  The prosecutor

22  argued in closing about whether the gun was loaded or not, but her statements must be put in

23  context.  She argued:

24

_____

25  [6]  Marcelino Nogueda provided inconsistent statements in testifying that his brother, petitioner,
26  would not use a gun and did not have a gun with him that night.  He also testified that the gun
   found in the gas station gas was probably left by someone else.  (RT 266-67.)  He additionally
27  testified that he did not remember whether petitioner kicked him in the back that night, contrary
   to his report to officers on the night of the event that petitioner kicked him when he was trying to
28  help Lorena.  (RT at 267-68.)

Finally, one other thing I thought about is do we reasonably know that the gun isn't loaded, and he had this the [sic] gun? You think about the heinous act he is doing of pointing this gun at a little baby and the people. I'm not going to point this at you because it is not professional and it is not right to do, but if I knew this gun wasn't loaded, it is very safe to point it at people, very safe. It is not going to go off.

Now, anybody who has had any experience with guns, you always assume that the gun is loaded, but we're not talking about someone who is willing to be safe with a gun, but he's pointing it willy-nilly at people because he knows it is not loaded. He knows it is not loaded. He doesn't care if he points it at the baby or his mom. It is not going to hurt anybody. It scares the living bejesus out of them.

THE COURT: Language, please Counsel.

MS. HAYS: It scares them, and that's what it is meant to do, absolutely. Because when someone pulls this back, and then points it at a person, what's that person thinking? That that gun is loaded, and it is going to fire. And that is what it is meant to do. And you can bang it around all you want, hopefully, you don't destroy property, but it is not going to go off. That's why Ms. Brushia can slam it on there. It is not going to go off. She's not afraid. It is not going to go off because it is not.

The bottom line truly is that the gun was there, that it was pointed at all those people.

(TR. 500-01.)  The prosecutor's statements did not concede the gun was not loaded but asked the jury to consider, for the sake of argument, that even if the gun had not been loaded, an assault with a semiautomatic firearm still took place.

Moreover, as pointed out by respondent, these statements were made during closing argument and constitute argument only, not evidence.

The fact that there was also evidence from which a jury could have concluded that petitioner did not point a gun at all three victims, or that some of the evidence regarding whether the gun was loaded was circumstantial, is all the more significant because the jury was presented with both scenarios for its consideration. As explained by the state appellate court, the jury was responsible for evaluating the credibility of the witnesses and was entitled to rely on evidence indicating that petitioner pointed a gun which the victims reasonably perceived was loaded.

The Court of Appeals limited its discussion to addressing Count 1, pointing a gun at Lorena Aramburo's head, but did not reference Counts 7 and 9, the assault with a gun on Laura

Rodriguez and Brittany Nogueda.  Nevertheless, petitioner did raise insufficiency of the evidence in regard to these additional counts in his appellate brief.  (Res't's Lod. Doc. 6 at 19.)  Pursuant to Johnson, therefore, this court must presume, subject to petitioner's rebuttal, that this claim as it pertains to Counts 7 and 9 was adjudicated on the merits.  As set forth above, the petition and traverse do not serve to rebut this presumption.  Furthermore, the court has reviewed the record as set forth in detail above, and finds that no habeas relief is available for Counts 7 and 9 insofar as sufficiency of the evidence is concerned.  See Stanley, 633 F.3d at 860; Himes, 336 F.3d 853.

Thus, the decision of the California Court of Appeal rejecting petitioner's claim that the evidence was insufficient to support the charges of assault with a semi-automatic firearm is not contrary to or an unreasonable application of Jackson to the facts of this case.  Certainly the decision is not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Richter,131 S. Ct. at 786-87.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

III.  Trial Court Failure to Sua Sponte Instruct Jury

Petitioner's next claim is that the trial court erred in failing to *sua sponte* instruct the jury that "an unloaded gun not used or threatened as a bludgeon could not support a finding of present ability to inflict an injury."  (ECF No. 1 at 12.)

Respondent argues that the court has no duty to *sua sponte* issue an instruction where defendant has not made a request for one or registered an objection at trial, and the failure to give one is not obviously prejudicial.

The California Court of Appeal denied petitioner's claim of court error, reasoning as follows:

> The trial court gave the following instruction on assault with a semiautomatic firearm:
>
> "In Counts 1, 2, 7 and 9, Mr. Nogueda is charged with assault with a semiautomatic firearm in violation of Penal Code Section 245. To prove him guilty of this crime, the People must prove ...
>
> "... that the defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; two, the defendant did that act willfully; three, when the defendant acted, he was aware of facts that would lead a

reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and, four, when he acted, he had a present ability to apply force with a semiautomatic firearm."

Defendant argues the trial court had a sua sponte duty to instruct the jury that if there was no evidence the gun was loaded or was to be used as a bludgeon, then there was no present ability to apply force with the weapon.

However, the trial court had no obligation to give such an instruction absent a request from counsel, and no such request was made.  Instructions that relate particular facts to a legal issue in the case are required to be given upon request, but are not required to be given sua sponte. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)  Hence, there was no error.

(2013 WL 542033 at *4.)

Petitioner's jury was given the instruction as set forth in the Court of Appeals' opinion.

(RT 434.)  The trial court then added:

Someone commits an act willfully when he or she does it willingly or on purpose.  It is not required that he or she intend to break the law, hurt someone else or gain any advantage.

The term application of force and apply force means to touch in a harmful or offensive manner.  The slightest touching can be enough if it is done in a rude or angry way.  Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly by causing an object to touch the other person.

The People are not required to prove that the defendant actually touched someone. The People are not required to prove that the defendant actually intended to use force against someone when he acted and no one needs to actually have been injured by his act. But if someone was injured, you may consider that fact along with all the other evidence in deciding whether the defendant committed an assault.

A semiautomatic firearm extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger.

(RT 434-35.)[7]

_____

[7]  In regard to the enhancements for Counts 1 through 10, for personally using a firearm, the court instructed in part:

A firearm does not need to be in working order if it was designed to

17

1    This court will not review the state court's rejection of petitioner's claim of jury

2    instruction error on state law grounds, because federal habeas relief is not available for alleged

3    error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.1, 5, 131

4    S. Ct. 13,16 (2010); Estelle, 502 U.S. at 67-68; Park v. California, 202 F.3d 1146, 1149 (9th Cir.

5    2000); see also Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11, 95 S. Ct. 1881 (1975) (federal

6    courts will not review an interpretation by a state court of its own laws unless that interpretation is

7    clearly untenable and amounts to a subterfuge to avoid federal review of a deprivation by the state

8    of rights guaranteed by the Constitution).

9    In order for the trial court's alleged erroneous instructions to warrant federal habeas relief,

10   petitioner must demonstrate that he suffered a violation of due process.  See Estelle, 502 U.S. at

11   72 ("The only question for us is 'whether the ailing instruction by itself so infected the entire trial

12   that the resulting conviction violates due process.'") (quoting Cupp v. Naughten, 414 U.S. 141,

13   147, 94 S. Ct. 396, 38 L.Ed.2d 368 (1973).  That is, in order for relief to issue, a challenged jury

14   instruction "cannot be merely 'undesirable, erroneous,' or even 'universally condemned,' 'but

15   must violate some due process right guaranteed by the fourteenth amendment.'"  Cupp, 414 U.S.

16   at 146.  See also Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir.1992).  The Due Process

17   Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the

18   fundamental elements of fairness in a criminal trial.'"  Rivera v. Illinois, 556 U.S. 148, 158, 129

19   S. Ct. 1446 (2009) (quoting Spencer v. Texas, 385 U.S. 554, 563-64, 87 S. Ct. 648 (1967)).  The

20   Supreme Court has defined 'very narrowly' the category of infractions that violate fundamental

21   unfairness.  Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668 (1990).

22   The conclusion of the California Court of Appeal that the trial court was correct under

23   California law in failing to give a *sua sponte* instruction to petitioner's jury to the effect that an

24   unloaded gun could not support a finding of present ability to inflict injury, is binding on this

25

26   ───────────────────────────────

27   shoot and it appears capable of shooting.

      A firearm does not need to be loaded.

28   (RT 444-445.)

                            18

1    court.[8]  See Bradshaw, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law,

2    including one announced on direct appeal of the challenged conviction, binds a federal court

3    sitting in habeas corpus").  Of course, any claim that the California Court of Appeal misapplied

4    state law is not cognizable in this federal habeas action.  Estelle, 502 U.S. at 68.

5        No Supreme Court precedent exists which requires a trial court to *sua sponte* give an

6    instruction where a defendant has not requested it.  See Namet v. United States, 272 U.S. 179,

7    190, 83 S.Ct. 1151 (1963) ("we see no reason to require such extravagant protection against

8    errors which were not obviously prejudicial and which the petitioner himself appeared to

9    disregard").  See also Lopez v. U.S., 373 U.S. 427, 436 (1963) (finding that where no request for

10   an instruction was made, and no objection given, petitioner was prevented from challenging it).

11   Clearly established precedent is limited to Supreme Court holdings that "squarely address [ ]" the

12   issue presented.  Wright v. Van Patten, 552 U.S. 120, 125 (2008).

13       Without established Supreme Court precedent, the state court decision could not have

14   been contrary to or an unreasonable application of federal law.

15       Accordingly, petitioner is not entitled to federal habeas relief with respect to this jury

16   instruction error claim.

17   IV.  Ineffective Assistance of Trial Counsel

18       Grounds Four, Five and Six allege ineffective assistance of trial counsel.

19       A.  Legal Standards Regarding Ineffective Assistance of Counsel

20       The clearly established federal law for ineffective assistance of counsel claims is

21   Strickland v. Washington, 466 U.S. 668 (1984).  To succeed on a Strickland claim, a defendant

22   must show that (1) his counsel's performance was deficient and that (2) the "deficient

23   performance prejudiced the defense."  Id. at 687.  Counsel is constitutionally deficient if his or

24   her representation "fell below an objective standard of reasonableness" such that it was outside

25   "the range of competence demanded of attorneys in criminal cases."  Id. at 687–88 (internal

26   quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

27
      _____

28   [8]  Petitioner does not raise a due process claim in regard to the alleged failure to give a *sua sponte* instruction.

1  fair trial, a trial whose result is reliable.'"  Richter, 131 S. Ct. at 787-88. (quoting Strickland, 466

2  U.S. at 687).

3          A reviewing court is required to make every effort "to eliminate the distorting effects of

4  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

5  conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 669; see Richter, 131 S.

6  Ct. at 789.  Reviewing courts must "indulge a strong presumption that counsel's conduct falls

7  within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  There

8  is in addition a strong presumption that counsel "exercised acceptable professional judgment in

9  all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

10 Strickland, 466 U.S. at 689).  This presumption of reasonableness means that the court must "give

11 the attorneys the benefit of the doubt," and must also "affirmatively entertain the range of

12 possible reasons [defense] counsel may have had for proceeding as they did."  Cullen v.

13 Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1407 (2011) (internal quotation marks and alterations

14 omitted).

15         Defense counsel has a "duty to make reasonable investigations or to make a reasonable

16 decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at 691.  Counsel

17 must, "at a minimum, conduct a reasonable investigation enabling him to make informed

18 decisions about how best to represent his client."  Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th

19 Cir. 1995) (quoting Sanders, 21 F.3d at 1456 (internal citation and quotations omitted).  See also

20 Porter v. McCollum, 558 U.S. 30, ___, 130 S. Ct. 447, 453 (2009) (counsel's failure to take "even

21 the first step of interviewing witnesses or requesting records" and ignoring "pertinent avenues for

22 investigation of which he should have been aware" constituted deficient performance).  On the

23 other hand, where an attorney has consciously decided not to conduct further investigation

24 because of reasonable tactical evaluations, his or her performance is not constitutionally deficient.

25 See Siripongs v. Calderon, 133 F.3d 732, 734 (9th Cir. 1998); Babbitt v. Calderon, 151 F.3d

26 1170, 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not

27 to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"

28 Wiggins v. Smith, 539 U.S. 510, 533 (2003) (quoting Strickland, 466 U.S. at 691).

1  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the time
2  of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting
3  Strickland, 466 U.S. at 690). Furthermore, "'ineffective assistance claims based on a duty to
4  investigate must be considered in light of the strength of the government's case.'" Bragg v.
5  Galaza, 242 F.3d 1082, 1088 (9th Cir. 2011) (quoting Eggleston v. United States, 798 F.2d 374,
6  376 (9th Cir. 1986)). See also Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir. 2011) (counsel
7  did not render ineffective assistance in failing to investigate or raise an argument on appeal where
8  "neither would have gone anywhere").

9  Under AEDPA, "[t]he pivotal question is whether the state court's application of the
10  Strickland standard was unreasonable." Id. at 785. "[B]ecause the Strickland standard is a
11  general standard, a state court has even more latitude to reasonably determine that a defendant has
12  not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

13  Prejudice is found where "there is a reasonable probability that, but for counsel's
14  unprofessional errors, the result of the proceeding would have been different." Strickland, 466
15  U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the
16  outcome." Id. "The likelihood of a different result must be substantial, not just conceivable."
17  Richter, 131 S. Ct. at 792.

18  B. Failure to Request Pinpoint Instruction

19  In Claim Four, petitioner contends that his trial counsel was ineffective in failing to
20  request a pinpoint, or clarifying, instruction requiring that the firearm be loaded in order to
21  convict him of assault with a firearm.

22  In denying this claim, the California Court of Appeal provided the following reasoned
23  state court decision, ruling as follows:

24  Defendant argues his trial counsel was ineffective for failing to
    request a pinpoint instruction that present ability required a loaded
25  gun or a threat to use the gun as a bludgeon. Defendant argues there
    was no tactical reason not to ask for the instruction or to argue that
26  the gun was not loaded, and that it is reasonably probable he would
    have been acquitted on counts 1, 7, and 9 if his counsel had done
27  either.

28  It is defendant's burden to prove that his counsel's representation

21

fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability the result would have been different but for counsel's errors. ( People v. Kelly (1992) 1 Cal.4th 495, 519–520.) We look to see if the record contains any explanation for the challenged actions. If the record sheds no light on why counsel acted or failed to act, the claimed error will be rejected unless counsel was asked to provide an explanation and did not, or there simply could be no satisfactory explanation. ( Id. at p. 520.) However, we will not second-guess trial counsel's reasonable tactical decisions. ( Ibid.) Moreover, even debatable trial tactics do not constitute ineffective assistance of counsel. ( People v. Weaver (2001) 26 Cal.4th 876, 928.) Effective assistance is not perfect assistance.

The defense theory was that while defendant may have been carrying a concealed gun on his person, he never used the gun to assault or threaten anyone. Defense counsel may have believed this to be the best argument, since there was some evidence the gun was loaded, as stated previously. Defense counsel may have reasonably concluded that defendant's position (i.e., that he never used the gun) would be made weaker by arguing that if he used the gun, it was unloaded, rendering him not presently able to commit an assault. Trial counsel may have reasonably believed that the major thrust of the defense was to avoid a finding that a gun was used at all, and, if successful, avoid all of the assault charges, rather than just three of the assault charges, and avoid all of the weapons enhancements. This is the type of tactical decision we will not second-guess.

(2013 WL 542033 at *4-5.)

Petitioner contends that his trial counsel was ineffective in failing to request an instruction that the gun was unloaded in light of the prosecutor's admission that the gun was unloaded. Petitioner refers to the prosecutor's rebuttal closing argument as set forth *supra* in the section addressing sufficiency of the evidence.   See RT 500-01.  Petitioner claims that his counsel had no tactical reason for not requesting such an instruction, and that the prosecution could not meet its burden to show that petitioner had a present ability to fire the gun.

The Court of Appeal's disposition was AEDPA reasonable for Count 1, but unreasonable in its disposition of this claim with respect to Counts 7 and 9.  These latter counts at issue did *not* involve the application of force insofar as using the weapon as a bludgeon, or club, or even touching instrument was involved.  Under the wording of Counts 7 and 9, as explained further by the prosecutor in final argument, the counts indicate that the weapon was pointed at a potential victim, not that the victim was beaten with it (as opposed to Count 2).  Therefore, under the clearly applicable law at the time of petitioner's trial, the only other "use" of a semi-automatic

1   weapon required that the weapon be loaded.  See legal discussion on sufficiency of the evidence

2   supra.

3          The evidence in Count 1 proved (according to the prosecutor) that he held the gun up to

4   Ms. Aramburo's head.  RT 454.  A reasonable inference is that the gun touched the victim's head,

5   and under the instructions, a mere touching was sufficient force for a conviction of use of an

6   assault weapon.  This inference is reasonable because Count 2 involved the actual beating of Ms.

7   Aramburo with the weapon.  Moreover, defense counsel's theory for *this* count was that petitioner

8   had not shown his gun at all.  Petitioner could not have been prejudiced by a failure to inform the

9   jury that the semi-automatic weapon had to be loaded because under counsel's theory the gun was

10  not present at all.

11         Not so for Counts 7 and 9.  As explained by the prosecutor, the evidence demonstrated a

12  pointing of the gun only:  "So in Count 7, we have an assault with a semi-automatic weapon

13  again, but this is against Ms. Rodriguez (the grandmother), and this is when he points the gun at

14  her."  RT 461.  Count 9 involved a "semiautomatic weapon held to the head of that baby,"

15  [Brittany]  RT 463, but the implication from the evidence received at trial is that this "holding of

16  the gun" was, at most,   cradling of the baby along with the gun or a pointing of the weapon at the

17  baby's head, and not an actual forceful touching with that weapon.  RT 169, 174 ("Q. Did you

18  talk about the fact that [petitioner] was charged with having *pointed guns* at you and the baby?),

19  177, 193, 194, 195-196198, 277-278, 280-281, 282.  For these counts, defense counsel's theory,

20  at least in part, was that the gun was not loaded.  RT 485, 489 ("And while he held her [the baby],

21  his mom saw the gun, but that gun was unloaded.  So that gun wasn't going to harm her.  The

22  magazine was empty.  No ammunition alerted by K-9s….Is that probable that he was able to hide

23  them so well that not even the K-9 or any of those officers found anything or is it more probable

24  that it was never loaded.")  Defense counsel had conceded that petitioner had a gun at this point in

25  the sequence of events, albeit it was unclear from where he had procured he gun.

26  / / /

27  / / /

28  / / /

23

1    Therefore, the Court of Appeal misread the record when it found that the only defense

2    theory was that petitioner had never shown a gun to the victims.[9]  This brings the discussion to a

3    review of the jury instructions which petitioner contends should have been supplemented with a

4    clear instruction that if a forceful touching was not at issue, the gun must have been loaded.  See

5    discussion at pp. 10-11 reviewing the two ways one can be convicted of assault with a semi-

6    automatic firearm—forceful touching with the weapon (loaded or unloaded), or pointing a loaded

7    semi-automatic weapon at its intended victim.

8    The instructions have been set forth completely in the previous section.  The instructions

9    by their plain English were directed only to the touching or beating aspect of assault with a semi-

10   automatic.  Not a single word indicates that the loaded/unloaded aspect of the firearm was

11   relevant.  While the fourth aspect of the requirements for conviction of assault with a semi-

12   automatic, the present ability to carry out the assault, could be stretched to encompass a "loaded

13   gun" situation, the instruction must have in some way referenced the two separate ways one could

14   be convicted of the semi-automatic assault offense in order for the jury to logically connect this

15   potential inference.[10]  To make matters much worse, the jury was affirmatively instructed on the

16   enhancement to the semi-automatic assault offense that the "personal use of a firearm"

17   enhancement did *not* require a loaded weapon. RT 444-445.  No reasonable counsel who argued

18   even partially that the firearm in question was not loaded could believe that this theory was

19   covered in semi-automatic assault instructions.  And just as clearly, a conviction on a semi-

20   automatic assault charge which depended on the loaded/unloaded distinction had to have been

21   prejudiced by the failure to instruct, or to offer an instruction, that the weapon had to be loaded.

22   The issue here is much different from, and not equivalent to, the finding that the evidence

23   was sufficient to find a loaded weapon.  The AEDPA standard for finding sufficiency of the

24   evidence is extremely deferential to the jury's decision, and does not depend on the weight of the

25

26   [9]  To be fair, counsel's argument was scattered by a back and forth between the various counts, some of which counsel strongly argued were performed without a gun being visible.

27   [10]  Even this aspect of the instruction would have been unduly confusing as the jury was also instructed with respect to "threats," that "an immediate ability to carry out the threat is not

28   required."  RT 439.

1   evidence.  It only requires that reading all inferences established by the evidence in favor of the

2   prosecution, and regardless of the contrary evidence, was there enough evidence for a reasonable

3   jury to convict, and was the appellate court reasonable in deciding, "yes."  Here the "click of the

4   weapon" sound, and the words and gestures of petitioner were very weak evidence of a loaded

5   firearm, but nevertheless sufficient, to convict on the semi-automatic assault charge.  It is quite a

6   different matter to conclude that counsel was reasonable in not pressing for the loaded weapon

7   instruction when the weight of the evidence favored the conclusion that the weapon was

8   unloaded.

9          C.  Failure to Secure a Shackling Ruling and Shackling

10         Petitioner's Claim Five alleges that his counsel failed to secure a ruling that petitioner not

11   be shackled at trial and failed to object on this point when he was later shackled during trial.

12   Although petitioner's counsel filed a pre-trial motion to preclude shackling or restraints during

13   trial, (CT 114-118), the court denied the motion because there was no declaration or evidentiary

14   support indicating "a likelihood of [petitioner] being shackled during trial."  Defense counsel

15   stated she would supplement the motion "next time."  (RT 20.)  Of note, the colloquy between

16   defense counsel and the court was as follows:

17             THE COURT:  All right.  People versus Nogueda, motions in
               limine.  One is to order that Mr. Nogueda not be shackled or
18             restrained in some way during the trial.  I didn't see any declaration
               in support of it that shows that there is a likelihood of him being
19             shackled during trial.  So without some sort of evidentiary support,
               I think I'm just supposed to deny the motion out of hand.
20
               I will give you a brief moment, though, to speak to what the
21             evidentiary support is, despite the lack of declaration, which I think
               only would have been another paragraph that you could have added
22             to the brief.

23             MS. BRUSHIA:  I can supplement it, your Honor.

24             THE COURT:  Next time you will.  Right?

25             MS. BRUSHIA:  I will next time.

26             THE COURT:  There you go.

27             MS. BRUSHIA:  I've filed them like this in the past.  The only
               thing that usually the Court does is look at the sheriff's department,
28             if there's been local write-ups or they have problems like that.

1    THE COURT:  I understand what I'm supposed to do.  I also
     understand that you are supposed to say he has been shackled or
2    he's going to be shackled or restrained during trial, therefore, you
     need a court order because otherwise my experience in trials over
3    the last couple of years has been once they walk them into the
     courtroom, they remove the restraints.

4
     Is there something that you know of that says that's not going to
5    happen this time?

6    MS. BRUSHIA:  No.

7    THE COURT:  I'm not going to bother ruling on the motion to
     show there's a need for it without any evidentiary support.
8

9    (RT 20-21.)

10        The record is silent as to petitioner's shackling status during trial except for the court's

11   jury instruction set forth below which directed the jury to ignore petitioner's shackles in arriving

12   at the verdict.

13        In rejecting this claim, the California Court of Appeal set forth its reasoned decision as

14   follows:

15        Defense counsel made an in limine motion to preclude defendant
          from being shackled or having a leg brace or stun belt during the
16        trial. The trial court would not rule on the motion because there was
          no declaration in support of the motion showing a likelihood of
17        defendant being shackled during trial. Defense counsel stated she
          would supplement the motion "next time." There is no further
18        motion or declaration appearing in the record. There is no evidence
          in the record that defendant was shackled or restrained in court.
19        *However, we may infer the defendant was restrained because of the
          jury instruction given.*
20
          The trial court gave the following instruction:
21
          "The fact that physical restraints have been placed on the defendant
22        is not evidence.... [A]nd Mr. Nogueda being in custody is not
          evidence of anything pertaining to any of the charges in this case.
23        And you must completely disregard this circumstance. Do not
          speculate about any reason. It cannot pertain in any way to your
24        decision on the issues in the case. Don't consider it for any purpose.
          Don't even discuss it during your deliberations."
25
          Defendant now claims his trial counsel rendered ineffective
26        assistance when she did not obtain a ruling on her in limine motion
          to prevent him from being physically restrained in court.
27
          As previously stated, if the record on appeal sheds no light on why
28        counsel acted or failed to act in a certain manner, a claim on appeal

                                    26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

of ineffective assistance of counsel will be rejected unless counsel was asked for an explanation and failed to give one, or there simply could be no satisfactory explanation. (People v. Gray (2005) 37 Cal.4th 168, 207.) Here, defense counsel may not have insisted on a ruling against restraints for the simple reason that defendant was not physically restrained in court. The record does not show there were any restraints placed on defendant during trial. Defendant has not shown his counsel was ineffective.FN3

FN3. We reject defendant's claim of cumulative error based on ineffective assistance of counsel, as there is no error to accumulate.

(2013 WL 542033 at *5-6.) (emphasis added)

The Ninth Circuit has recently clarified the standard to be used in analyzing a shackling violation which is brought as a claim of ineffective assistance of counsel.  Although the subject matter underlying the ineffective assistance claim may concern due process or another constitutional violation, the Strickland standard is the only one to be applied.  Walker v. Martel, 709 F.3d 925, 940 (9th Cir. 2013), rev'g and remanding 2011 WL 2837406 (N.D. Cal. Jul. 13, 2011).  See Walker v. Martel 2011 WL 2837406 (N.D. Cal. Jul. 13, 2011), rev'd and remanded, 709 F.3d 925 (9th Cir. 2013), (incorrectly analyzing claim under due process shackling cases instead of applying the Strickland standard); Premo v. Moore, 562 U.S. 115, 131 S.Ct. 733, 740 (2011) (reversing Ninth Circuit because it had improperly focused on Fulminante's discussion of admission of an involuntary confession in violation of the Fifth Amendment instead of Strickland).  Of particular note, the Ninth Circuit emphasized that Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007 (2005), a clearly established shackling case, held that presumed prejudice applies where the jury sees the defendant's shackles without adequate court justification; however, Strickland has set forth only three types of cases where prejudice is presumed, and shackling is not one of them.  Walker, 709 F.3d at 941.

As another point of clarification, the Ninth Circuit stated in reversing the district court in Walker:

Typically, even if the requirements of 28 U.S.C. § 2254(d) are satisfied, habeas relief nevertheless requires a further showing of "actual prejudice." Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). However, because the relevant "clearly established law" in this case, the Strickland test for ineffective assistance of counsel claims, already includes its own prejudice prong, the Brecht inquiry would be duplicative. See

1

2

3

4

> Musladin v. Lamarque, 555 F.3d 830, 834 (9th Cir.2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we apply Strickland's prejudice standard and do not engage in a separate analysis applying the Brecht standard.").

5

Walker, 709 F.3d at 939 n. 4.

6

7

8

  In his verified petition, petitioner claims that he was placed in physical restraints during the trial despite the lack of a stated reasonable concern for safety by the court, and that the judge took no special precautions to conceal the restraints from the jury.  (ECF No. 1 at 16.)

9

10

11

12

13

14

15

16

  According to petitioner, after the court denied defense counsel's motion in limine on the shackling issue, the matter was not raised again until the court instructed the jury as quoted by the Court of Appeals *supra*.  (RT 426.)  Petitioner argues that rules and cases require that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of 'a manifest need' for such restraints," security concerns, or "adequate justification."  (ECF No. 1 at 16, ECF No. 27 at 5.)  He contends that counsel's "failure to obtain a ruling and to object further when shackles were imposed on appellant cannot be explained by any conceivable tactical justification."  (ECF No. 27 at 6.)

17

18

19

20

21

22

  Petitioner further contends that the court's instruction presented as fact that restraints were placed on him, and there can be no doubt he was shackled in a way that was visible to the jury. Petitioner has stated that he was placed in physical restraints, and that the judge "cited no reasonable concern for the safety of court personnel," and that "the trial judge took no special precautions to conceal petitioner['']s restraints from the jury."  (Verified Pet'n, ECF No. 1 at 16.) In his traverse petitioner states that the "shackles were visible to the jury."  (ECF No. 27 at 6.)

23

24

25

26

27

28

  Respondent counters that the record is "absolutely silent" in regard to whether petitioner wore shackles in the courtroom.  Respondent construes the Court of Appeal's opinion as inferring from the shackling instruction that petitioner may have worn shackles to and from the courtroom. Respondent insists, however, that petitioner has the burden to prove under the deficient performance prong that his counsel could have received a favorable ruling regarding wearing shackles to and from the courtroom.  Respondent asserts that the cases cited by petitioner are

28

1   limited to courtroom appearances.  Respondent further argues that petitioner cannot show

2   prejudice in light of the lack of proof that the jury saw him in shackles, or the court's instruction

3   to disregard the shackles.

4          It should first be noted that the habeas petition filed with the state superior court did not

5   raise shackling as a claim.  Therefore, the only record before the court is the record on direct

6   appeal.

7          First, the court finds that the state court of appeals made an unreasonable determination of

8   the facts, in light of the trial court's instruction: "[t]he fact that physical restraints have been

9   placed on the defendant is not evidence."  The court of appeals very logically inferred that

10  petitioner was restrained based on the trial court's instruction, but then inconsistently reasoned,

11  "defense counsel may not have insisted on a ruling against restraints for the simple reason that

12  defendant was not physically restrained in court.  The record does not show there were any

13  restraints placed on defendant during trial."  (Opinion quoted above.)  This rationale flies in the

14  face of the shackling instruction and first finding, and is not an objectively reasonable finding of

15  the facts.  The latter finding that counsel did not object because no shackling occurred during trial

16  is mere speculation.  Even if this speculation could be afforded the status of a reasonable

17  inference, when two conflicting, equally persuasive inferences can be drawn from an incomplete

18  record, the result reached cannot be a reasonable factual determination.  In such situations, the

19  very common result on direct appeal is to find that the ineffective assistance of counsel issue is

20  not susceptible of determination on direct review.  See e.g., People v. Fosselman, 23 Cal. 3d 412,

21  425-26 (1979).  It cannot be said that if petitioner was shackled during trial, and counsel did

22  nothing to bring the matter to the court's attention, counsel's actions were reasonable.  An

23  evidentiary hearing would be necessary to determine this matter, as well as other potential

24  subsidiary matters such as attempts to disguise shackling.

25         The undersigned recognizes:  "When § 2254(d) applies, the question is not whether

26  counsel's actions were reasonable.  The question is whether there is any reasonable argument that

27  counsel satisfied Strickland 's deferential standard."  Premo v. Moore, 562 U.S. 115, 131 S.Ct.

28  733, 740 (2011) (quoting Richter, 562 U.S. at 89, 131 S.Ct. at 778).  However, there are limits to

1   this directive, and reasonable arguments cannot be based upon pure speculation.  And in light of

2   the explicit instruction to the jury concerning shackling which made it appear that petitioner was

3   shackled at all times during trial, speculating that counsel may have not objected because

4   restraints were not visible, or that shacking occurred only to and from the courtroom is just that—

5   speculation.

6          As to the prejudice prong, it must be "reasonably likely" the result would have been

7   different.  "The likelihood of a different outcome must be 'substantial,' not merely 'conceivable,'

8   Richter, 131 S.Ct. at 792, and when Strickland and AEDPA operate 'in tandem,' as here, the

9   review must be 'doubly' deferential."  Walker, 709 F.3d at 941, citing Richter, 131 S.Ct. at 788;

10  Knowles, 556 U.S. at 123.  Prejudice may be assessed by the type and visibility of shackling, the

11  instructions of the court, the subject matter of the case.  And as held by Walker, the prejudice

12  inquiry may take into account matters other than the mere fact of shackling, as it is the effect on

13  the verdict which is the ultimate Strickland inquiry.

14         The prejudice inquiry is not possible to decide on the present record.  The type and extent

15  of shackling, although not dispositive in and of itself, is not known but is important.  Indeed, it is

16  not known as a fact whether shackling took place in the courtroom at all.  The undersigned cannot

17  attribute an AEDPA reasonableness to the Court of Appeal's lack of prejudice finding when key

18  facts underlying such a determination are simply not known.

19         In light of the present record, the undersigned orders an evidentiary hearing on the issue of

20  shackling.  An evidentiary hearing is permitted under federal habeas law when the fact finding

21  process underlying a conclusion by the state courts is itself inadequate to resolve the issue.

22  Hurles v. Ryan, 752 F.3d 768, 790-791 (9th Cir. 2014).  For the reasons set forth above, the

23  inadequate record on shackling herein requires such a hearing to ascertain the reasonableness of

24  counsel's actions and the prejudice, if any, from such actions/inactions.

25         D.  Failure to Object to Prosecution's Highly Prejudicial Testimony

26         Petitioner's final claim (Six) is that his counsel failed to object to the prosecutor's

27  introduction of highly prejudicial testimony on three occasions:  that the prosecutor prompted

28  responses from Aramburo that petitioner had been in jail before the incident; that she was also

30

1    questioned about something petitioner said on the phone that night about Sureños; and that

2    Rodriguez was similarly questioned about petitioner's prior incarceration, and that she had called

3    police to report petitioner in the past.

4           Respondent counters that defense counsel's failure to object was a tactical strategy to

5    enhance credibility with the jury, and to purposely not draw attention to this testimony which

6    might have been highlighted if an objection had been made.

7           The California Court of Appeal rejected petitioner's claim as set forth in the following

8    portion of the opinion:

9           Defendant claims he received ineffective assistance because his
10          trial counsel failed to object to the following testimony: (1) that
            defendant had been in jail previously, (2) that Rodriguez previously
11          had called police to report defendant, and (3) that Aramburo heard
            defendant mention Sureños on the telephone.

12          As previously indicated, we do not second-guess reasonable tactical
            decisions, and the decision whether to object "is a matter of trial
13          tactics as to which we will not exercise judicial hindsight." (People
            v. Kelly, supra, 1 Cal.4th at p. 520.)
14

15          The defense theory, that defendant beat up Aramburo, but did not
            use a gun on her in any fashion, depended on the jury believing that
16          defendant was admitting his only culpability and had nothing
            further to hide, as demonstrated by his concession that he beat
17          Aramburo. Had defense counsel objected whenever something
            about defendant's criminal past been mentioned by a witness, this
18          defense would have been compromised. Instead, defendant's trial
            counsel tried to neutralize the evidence of defendant's past
19          incarceration by getting Aramburo to admit that defendant was not
            in jail, but in juvenile hall. The decision to neutralize the testimony
20          rather than to object was a reasonable tactical choice.

21          As for Rodriguez's testimony that she had called the police before
            to turn in defendant, defense counsel may have reasonably believed
22          that such evidence would boost Rodriguez's credibility because it
            showed she was willing to admit when her son, defendant, had done
23          something wrong. If she could be relied upon to turn him in before
            when he committed a wrong, she could be relied upon now when
24          she insisted he never had a gun. This was a reasonable tactical
            decision.

25          It was also a reasonable tactical decision not to object to
            Aramburo's testimony that defendant mentioned something about
26          Sureños when he answered her phone. Counsel reasonably could
            have believed the evidence was less harmful if it was not
27          emphasized by an objection, which may have implied the defense
            was trying to hide a gang connection. There was no further mention
28          of the word, and no evidence defendant was associated with a gang.

31

1                         Counsel's decision not to object did not amount to ineffective
                     assistance.

2

3    (2013 WL 542033 at *5.)

4           The California Court of Appeal's conclusion that petitioner's trial counsel did not render

5    deficient performance in declining to object to the aforementioned prosecutor elicited testimony

6    is not unreasonable.  On habeas review, a reviewing court must give attorneys the benefit of the

7    doubt after considering "the range of possible reasons [defense] counsel may have had for

8    proceeding as they did."  Pinholster, 131 S.Ct. at 1407.  As explained by the state appellate court,

9    petitioner's trial counsel may have had tactical reasons for failing to object to testimony by

10   Aramburo and Rodriguez regarding petitioner's reference to a gang, his prior incarceration, and

11   whether his mother had previously reported him to police, such as a desire to avoid highlighting

12   unfavorable evidence.  The action of petitioner's counsel was inherently a matter of strategy and

13   trial tactics, as pointed out by the California Court of Appeals.

14          Nor has petitioner demonstrated that his trial counsel's performance resulted in prejudice.

15   As the Court of Appeal stated, the gang reference was the only time in the trial that it came up,

16   and there was no other evidence introduced concerning petitioner's affiliation with a gang.

17   Furthermore, the record indicates that although she did not object, trial counsel effectively cross-

18   examined Aramburo and Rodriguez.  See e.g. RT at 106 (pointing out that petitioner ended up in

19   juvenile hall, not prison).  The evidence against petitioner, which included multiple eyewitnesses

20   to the events at issue, was compelling with respect to those counts where a physical beating was

21   concerned.  Given the evidence, there is no reasonable probability that, but for counsel's failure to

22   object to the testimony, the result of the proceedings would have been different.

23          The decision of the California Court of Appeal denying this claim of ineffective assistance

24   of counsel is not contrary to or an unreasonable application of Strickland.  Accordingly, petitioner

25   is not entitled to federal habeas relief.

26          E.  Cumulative Error

27          Petitioner raises for the first time in his traverse a claim of cumulative error based on the

28   alleged numerous instances of ineffective assistance of counsel.  Petitioner has waived such a

1 claim by failing to raise it in his petition, preventing respondent from filing a response to it.

2 CONCLUSION

3      For all of the foregoing reasons, the petition is granted with respect to Counts 7 and 9

4 based upon counsel's ineffectiveness in not requesting a jury instruction that the gun in question

5 in this case had to be loaded.  However, no final judgment will be entered on these claims until

6 after an evidentiary hearing is held on the shackling issue.

7      IT IS HEREBY ORDERED that:

8      1.  The Federal Defender is appointed to represent petitioner at an evidentiary hearing on

9 the shackling issue which will be set in the near future taking into account counsels' schedules.

10      2.  Counsel shall contact Jonathan Anderson, Courtroom Deputy, at (916) 930-4072, to

11 select a date for the hearing.

12      3.  The Clerk of the Court shall serve a copy of this order on David M. Porter, Assistant

13 Federal Defender.

14 Dated: May 18, 2015

15                          /s/ Gregory G. Hollows

16                      UNITED STATES MAGISTRATE JUDGE

17

18

19 GGH:076/Nogu1045.hc

20

21

22

23

24

25

26

27

28

33